UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-22119-CIV-ALTONAGA/Simonton

LAW OFFICES LA LEY con JOHN H.
RUIZ, P.A. and JOHN H. RUIZ, P.A.,

       *Plaintiffs*,

    v.

RUST CONSULTING, INC., OFFICE OF
THE COMPTROLLER OF THE
CURRENCY, and the FEDERAL RESERVE
BOARD,

       *Defendants*.

_____/


**FEDERAL DEFENDANTS'
MOTION TO VACATE TEMPORARY INJUNCTION WITHOUT NOTICE
AND TO DISMISS PLAINTIFF'S COMPLAINT ON EXPEDITED BASIS
AND INCORPORATED MEMORANDUM OF LAW**

## MOTION TO VACATE TEMPORARY INJUNCTION WITHOUT NOTICE AND TO DISMISS PLAINTIFF'S COMPLAINT ON EXPEDITED BASIS

Defendants, Office of the Comptroller of the Currency ("OCC") and Board of Governors of the Federal Reserve System ("Federal Reserve Board" or "Board," together with OCC, "Federal Defendants"), through their undersigned counsel, respectfully move this Court to vacate the Order on Temporary Injunction without Notice entered by the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida ("Miami-Dade Circuit Court"), and to dismiss with prejudice the Verified Emergency Petition for Temporary Injunction without Notice and for Declaratory Judgment ("Petition") filed by Law Offices La Ley con John H. Ruiz, P.A. and John H. Ruiz, P.A. (collectively "Plaintiff") pursuant to Rule 12(b)(1) and (6) and Rule 65(b)(4) of the Federal Rules of Civil Procedure for the reasons stated herein.[1]

Federal Defendants seek an ***expedited briefing schedule*** on their motion to dismiss so as to allow a ruling on the motion prior to July 15, 2013, which is the last scheduled disbursement date for payments that are at issue in this matter.

### MEMORANDUM OF LAW IN SUPPORT OF MOTIONS

This litigation is an attempt by the Plaintiff, a lawyer (and his law firm) who allegedly represents certain mortgage borrowers, to interfere with administrative orders issued by the OCC

---

[1] Once a case is removed to Federal court, the duration of an *ex parte* temporary restraining order granted by a state court is governed by the Federal Rules of Civil Procedure, as calculated from the date that the case is removed. *See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers, Local No. 70*, 415 U.S. 423, 439-40 (1974) ("An *ex parte* temporary restraining order issued by a state court prior to removal remains in force after removal no longer than it would have remained in effect under state law, but in no event does the order remain in force longer than the time limitations imposed by Rule 65(b), measured from the date of removal."); *accord Rothner v. City of Chicago*, 879 F.2d 1402, 1419 (7th Cir. 1989); *Biomedical Instrument and Equip. Corp. v. Cordis Corp.*, 797 F.2d 16, 18 (1st Cir. 1986). *See also Castleberry v. Goldome Credit Corp.*, 408 F.3d 773, 784 (11th Cir. 2005) (Quoting *Granny Goose Foods, Inc.*, 415 U.S. at 438) ("The Federal Rules of Civil Procedure, like other provisions of federal law, govern the mode of proceedings in federal court after removal."). Pursuant to Federal Rule of Civil Procedure 65(b)(2), a temporary restraining order expires, at the latest, after 14 days. This action was removed to Federal court on June 13, 2013. *See* Dkt. # 1. As such, measuring from the date of removal, the temporary restraining order here expires at the end of the day on June 27, 2013.

and the Federal Reserve Board intended to speed relief to mortgage borrowers who may have been affected by their loan servicers' practices.  The litigation concerns the Independent Foreclosure Review ("IFR") and, more particularly, disbursements from the $3.6 billion Qualified Settlement Funds ("QSF") that were subsequently created in connection with that review process.  The IFR and the QSF, respectively, were requirements of administrative cease-and-desist orders ("Consent Orders") and subsequent amendments to those orders ("Amendments") that were issued pursuant to 12 U.S.C. § 1818(b) between April 2011 and February 2013 by the OCC, the former Office of Thrift Supervision ("OTS"),[2] and the Federal Reserve Board and consented to by certain of the Nation's largest mortgage servicers.

Pursuant to the Consent Orders, issued to address deficient practices in mortgage servicing and foreclosure processing, the IFR process was created to provide a mechanism by which borrowers whose homes were involved in a foreclosure that was in process or completed in 2009 or 2010 by one of the Consent Order servicers ("Eligible Borrowers") could request an independent review of their file to determine whether the servicer's errors, misrepresentations or other deficiencies had resulted in financial harm to the borrower.  The IFR also required an independent review of loan files for certain Eligible Borrowers based on sampling techniques, regardless of whether the borrower requested a review.

In January of this year, the OCC and the Federal Reserve Board reached agreements in principle with 13 of the 16 original mortgage servicers subject to the Consent Orders.  The

---

[2] On July 21, 2011 ("transfer date"), pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act") § 312, 12 U.S.C. § 5412(b)(2)(B)(i)(2010), all functions of the Office of Thrift Supervision ("OTS") relating to federal savings associations (FSAs) were transferred to the OCC, which assumed responsibility for the ongoing examination, supervision, and regulation of FSAs.  The Dodd-Frank Act continues in effect all OTS orders, resolutions, determinations, agreements, regulations, interpretive rules, other interpretations, guidelines, procedures, and other advisory materials in effect the day before the transfer date, and allows the OCC to enforce these issuances with respect to FSAs, unless the OCC modifies, terminates, or sets aside such guidance or until superseded by the OCC, a court, or operation of law.  Dodd-Frank Act § 316(b), 12 U.S.C. § 5414.

agreements required the 13 servicers ("Participating Servicers") to provide $3.6 billion in cash payments to Eligible Borrowers through the QSF and $5.7 billion in other foreclosure prevention assistance.  As a result of these agreements, the Participating Servicers have ceased the IFR. [3]

Following the agreements, these 13 Participating Servicers entered into the Amendments with the Federal Defendants, which memorialized the terms of the agreements in principle and replaced the portion of the Consent Orders related to the IFR.[4]  Under the Amendments, <u>all</u> Eligible Borrowers at Participating Servicers are entitled to receive compensation significantly more quickly and without regard to whether they had filed a request for review form or suffered any financial injury as a result of errors, misrepresentations, or deficiencies associated with the servicers' foreclosure practices.  Borrowers need not take any action to receive the payments, and accepting payment does not waive any of their legal rights to pursue claims against the servicers related to the handling of the borrower's foreclosure. [5]  As described in the Amendments, Defendant Rust Consulting, Inc. has been retained by the Participating Servicers as Paying Agent for the QSF and is the entity responsible for remitting payments to Eligible Borrowers at the direction of the Federal Defendants.

Plaintiff alleges that he represented some Eligible Borrowers in Florida state foreclosure actions, that he filed requests for review in the IFR on their behalf, and that some of these clients owe him attorney's fees and costs for that work.  He claims that under Florida law he is entitled

---

[3] The Participating Servicers that are parties to the Amendments are Aurora, Bank of America, Citibank, Goldman Sachs, HSBC, JPMorgan Chase, MetLife Bank, Morgan Stanley, PNC, Sovereign, SunTrust, U.S. Bank, and Wells Fargo as well as certain of their respective bank holding companies and affiliated subsidiaries.

[4] The Amendments are available on the websites of the OCC and the Board.  *See* http://occ.gov/news-issuances/news-releases/2013/nr-ia-2013-35.html (OCC); http://www.federalreserve.gov/newsevents /press/enforcement/20130228a.htm (Board).

[5] *See*, *e.g.*, Exhibit 3 (Amendment to April 13, 2011 Consent Order between OCC and Bank of America, N.A.), Art. V, § (3) ("In no event shall the Bank request or require any borrower to execute a waiver of any claims against the Bank (including any agent of the Bank) in connection with any payment or Foreclosure Prevention assistance pursuant to this Amendment to the Consent Order").  The Amendments issued by the Federal Reserve Board contain similar language.  *See*, *e.g.*, Exhibit 4 (Amendment of Consent Order between Federal Reserve Board and SunTrust Banks, Inc., SunTrust Bank, and SunTrust Mortgage, Inc.), ¶ 11.

to assert Florida state court "charging liens" in connection with this work, and seeks through this lawsuit to divert to himself and his law firm some of the cash payments that would otherwise go directly to his alleged clients from the QSF.

Plaintiff commenced the instant action on June 5, 2013, when he filed his Petition against the Federal Defendants and Defendant Rust Consulting, Inc., in Miami-Dade Circuit Court; the Federal Defendants received the petition on June 11, 2013. Plaintiff's Petition asserts claims for a temporary injunction and declaratory judgment against all Defendants, including Federal Defendants, seeking to prevent Defendants from disbursing certain funds to borrowers whose foreclosure proceedings were undergoing administrative review under the IFR. On June 12, 2013, the Miami-Dade Circuit Court entered an Order on Temporary Injunction without Notice preventing Defendants "from disbursing the IFR settlement checks directly to the borrowers/clients of [Plaintiff] until further order of [the] Court * * * ." On June 13, 2013, the Federal Defendants removed the action to this Court pursuant to 28 U.S.C. § 1442(a).

## FACTUAL BACKGROUND

### A.  <u>Parties</u>

The OCC is a bureau of the Treasury Department that functions as the primary supervisor for federally-chartered banks ("national banks" and "federal savings associations"), as well as federal branches and agencies of foreign banks in the United States. *See* 12 U.S.C. §§ 21 *et seq*. The OCC administers statutory provisions governing virtually every aspect of the national banking system, from the authority to charter new national banks and federal savings associations to appointment of a receiver for an insolvent national bank or federal savings association. *See* 12 U.S.C. §§ 21, 191. "[T]he supervisory power of the Comptroller extends over all aspects of a [national] bank's existence." *In re Franklin Nat'l Bank Securities*

*Litigation*, 478 F. Supp. 210, 217 (E.D.N.Y. 1979).

The Federal Reserve Board is a federal agency authorized by law to regulate and examine or inspect bank holding companies, their nonbank subsidiaries, and state-chartered banks that are members of the Federal Reserve System.  12 U.S.C. §§ 1844, 248(a).  The Board is charged, among other duties, with ensuring that the state member banks and bank holding companies it supervises operate in a safe and sound manner and in compliance with applicable laws and regulations.  *See, e.g.,* 12 U.S.C. §§ 248(a)(1), 325.

In furtherance of their statutory responsibilities, the OCC and the Board are authorized under section 8(b) of the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811 *et seq.*, to order banking organizations for which they are the respective "appropriate Federal banking agency" to cease and desist from engaging in unsafe or unsound practices or violations of law, and also to take "affirmative action" to correct the conditions resulting from any such practices or violations. 12 U.S.C. § 1818(b).  The affirmative action that section 8(b) authorizes the federal banking agencies to order banking organizations to take is broad and includes restitution and reimbursement.  12 U.S.C. § 1818(b)(6)(A).  Orders under § 1818(b) may be issued on the consent of the respondent banking institution, as in the case of the Consent Orders and Amendments.

Rust Consulting, Inc. ("Rust Consulting" or "Rust"), a professional services company, coordinates large projects requiring data management, notification, contact centers, claims processing, or fund distribution.  Rust is acting as the Paying Agent to distribute payments from the QSF to the Eligible Borrower population in accordance with the Amendments.

According to Plaintiff's pleadings, Law Offices La Ley con John H. Ruiz, P.A. and John H. Ruiz, P.A. are incorporated in the State of Florida as professional associations and operate as

a law firm in Miami-Dade County, Florida.  Plaintiff alleges that the firm has represented

"thousands" of individuals who have either sued or been sued by mortgage lenders and/or

mortgage servicers and that it is owed "millions" of dollars by its clients.  Plaintiff also alleges

that it has a valid charging lien against QSF monies to be disbursed by Rust to the Plaintiff's

clients.

        **B.**       **Independent Foreclosure Review**

       The Consent Orders issued in 2011 and 2012 required the mortgage servicers to promptly

correct deficiencies in residential mortgage loan servicing and foreclosure practices that

examiners had identified in reviews conducted during the fourth quarter of 2010.[6]  The Consent

Orders required the servicers to make significant improvements in practices for residential

mortgage loan servicing and foreclosure processing, including practices involving

communications with borrowers and "dual-tracking" in which servicers continue to pursue

foreclosure during the loan modification process.  Each of the Consent Orders also required each

servicer to engage an independent consultant to conduct a review of foreclosure actions taken by

the servicer between January 1, 2009 and December 31, 2010 to determine whether foreclosures

complied with federal and state laws, whether foreclosures occurred when grounds for

foreclosure were not present (for example, if loans were performing), and whether any errors,

misrepresentations or other deficiencies resulted in financial injury to borrowers.  The Consent

Orders also required each servicer to establish a process for borrowers who believed they had

been financially harmed by such deficiencies to make submissions of their file to be reviewed

and considered for remediation. These processes –  the independent consultants' review of

samples of the servicers' files and the borrowers' submitted requests for review – became known

---

[6] *See*, *e.g.*, Exhibit 1 (Consent Order between OCC and Bank of America, N.A.) and Exhibit 2 (Consent Order between Federal Reserve Board and SunTrust Banks, Inc., SunTrust Bank, and SunTrust Mortgage, Inc.).

as the Independent Foreclosure Review, or IFR.  In order to ensure that those borrowers harmed by their servicer's misconduct were made whole, each servicer also was required to submit a plan to remediate all financial injury to borrowers caused by any errors, misrepresentations, or other deficiencies identified in the independent consultants' IFR findings.

In early 2013, the provisions of the Consent Orders requiring the IFR were replaced by new obligations spelled out in the Amendments, which were negotiated in January 2013 and issued in February 2013.  These new obligations, among other things, require the Participating Servicers to make $3.6 billion in cash payments to the QSF, which are to be distributed by Rust to Eligible Borrowers pursuant to the Federal Defendants' direction.[7]

The purpose of these Amendments was to ensure that Eligible Borrowers would be the ones who benefitted from the IFR and that money would go to them more quickly, helping to speed recovery in the Nation's housing markets.  As the Comptroller of the Currency explained:

> When we began the Independent Foreclosure Review, the OCC pledged to fix what was broken, identify who was harmed, and compensate them for that injury. While today's announcement represents a significant change in direction, it meets those original objectives by ensuring that consumers are the ones who will benefit, and that they will benefit more quickly and in a more direct manner.
>
> We have learned a great deal from the reviews that have been conducted to date. However, it has become clear that carrying the process through to its conclusion would divert money away from the impacted homeowners and also needlessly delay the dispensation of compensation to affected borrowers. Our new course of action will get more money to more people more quickly, and it will speed recovery in the nation's housing markets.

See OCC Press Release of January 7, 2013: Statement from Comptroller of the Currency Thomas

---

[7] See, e.g., Exhibit 3 (Amendment to April 13, 2011 Consent Order between OCC and Bank of America, N.A.) and Exhibit 4 (Amendment of Consent Order between Federal Reserve Board and SunTrust Banks, Inc., SunTrust Bank, and SunTrust Mortgage, Inc.).  The Participating Mortgage Servicers also agreed to offer $5.7 billion in other assistance to borrowers such as loan modifications and forgiveness of deficiency judgments.

J. Curry on the IFR Settlement (available at http://el.occ/news-issuances/news-releases/2013/nr-occ-2013-4.html, last visited on June 19, 2013).

Eligible Borrowers covered by the Amendments include borrowers whose homes were involved in any stage of the foreclosure process in 2009 or 2010 and whose mortgages were serviced by one of the 13 Participating Servicers.  The Amendments do **not** require that the borrowers take any additional steps to receive the payments or to waive any legal claim they may have against their servicer as a condition for receiving payment.  Eligible Borrowers receive compensation whether or not they filed a request for review form pursuant to the original Consent Orders, whether or not their servicer committed any errors, misrepresentations or deficiencies with respect to their foreclosure, and whether or not the borrower suffered any financial injury.

## STANDARD OF REVIEW

### A.      Rule 12(b)(1) Standard

Because "Federal courts are courts of limited jurisdiction," *Lazarre v. JPMorgan Chase Bank, N.A.*, 780 F. Supp. 2d 1320, 1323 (S.D. Fla. 2011) (citation omitted), a court must dismiss an action if it determines, at any time, that it lacks subject-matter jurisdiction.  Fed. R. Civ. P. 12(h)(3).  When a challenge is brought under Rule 12(b)(1), the plaintiff bears the burden of establishing federal subject-matter jurisdiction.  *See Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1247 (11th Cir. 2005) (citation omitted).  It is well settled that, when considering a motion to dismiss for lack of subject-matter jurisdiction, a court may consider factual matters outside of the pleadings, such as testimony and affidavits.  *Lawrence v. Dunbar*, 919 F.2d 1525,

1529 (11th Cir. 1990) (citation and internal quotation marks omitted).[8]

## B.   Rule 12(b)(6) Standard

In reviewing a motion to dismiss under Rule 12(b)(6), a court must accept as true all factual allegations contained in the complaint, but is "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted). Threadbare recitations of the elements of a cause of action, supported only by conclusory statements, do not suffice. *Id.* Further, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679.  Moreover, when the "plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment."  *Brooks v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citation omitted).  Here, because Plaintiff's pleadings rely on the Consent Orders and the Amendments, this Court may consider these documents without converting the instant motion into a motion for summary judgment.

## C.   Injunctive Relief Standard

A district court may grant a preliminary injunction only upon the movant's showing that (1) it has a substantial likelihood of success on the merits, (2) the movant will suffer irreparable injury unless the injunction is issued, (3) the threatened injury to the movant outweighs the possible injury that the injunction may cause the opposing party, and (4) if issued, the injunction

---

[8] *See also Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947) ("[W]hen a question of the District Court's jurisdiction is raised, either by a party or by the court on its own motion . . . the court may inquire by affidavits or otherwise, into the facts as they exist."); *Bryant v. Rich*, 530 F.3d 1368, 1376 (11th Cir. 2008) (citation omitted) (A court "may make factual findings about subject matter jurisdiction on a Rule 12(b)(1) motion to dismiss."); *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981) (collecting cases and noting that "[t]he unique power of district courts to make factual findings which are decisive of jurisdiction is, therefore, not disputed.").

would not disserve the public interest. *See Horton v. City of St. Augustine, Fla.*, 272 F.3d 1318, 1326 (11th Cir. 2001) (citing *Siegel v. Lepore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc)). It is well established in this circuit that "[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' " as to all four elements. *Id.* (citing *Siegel*, 234 F.3d at 1175).

## ARGUMENT

The temporary injunction entered *ex parte* by the Miami-Dade Circuit Court should be vacated because Plaintiff's claim is meritless and Plaintiff is not entitled to any injunctive relief. For the same reasons, Plaintiff's action for injunctive and declaratory relief should be dismissed with prejudice.

*First*, no court has jurisdiction to enjoin disbursement of QSF checks to Plaintiff's clients. The payments in question are part of a series of administrative orders issued by the OCC and the Federal Reserve Board pursuant to 12 U.S.C. § 1818(b). Congress has withdrawn the jurisdiction of any court to "affect by injunction or otherwise the issuance or enforcement of any notice or order under [12 U.S.C. § 1818(b)], or to review, modify, suspend, terminate, or set aside any such notice or order." 12 U.S.C. § 1818(i)(1).

*Second*, even if the Court had subject-matter jurisdiction over this case, as a matter of Florida law Plaintiff does not have a legally cognizable charging lien over any funds being paid out to his clients under the Amendments. Under Florida law, an attorney may only establish a charging lien over funds paid to a client as a result of a settlement or judgment in a lawsuit in which the attorney represented the client as a party. Plaintiff has no charging lien that can be legally enforced because he did not represent any party in the federal administrative proceeding that led to the issuance of the Consent Orders – no individual borrower was a party to those

10

actions, and Eligible Borrowers will receive compensation from the QSF whether or not they filed a request for review form pursuant to the original Consent Orders, whether or not their servicer committed any errors, misrepresentations or deficiencies with respect to their foreclosure, and whether or not the borrower suffered any financial injury.

*Third*, with respect to the temporary injunctive relief already entered by the Miami-Dade Circuit Court and the permanent injunctive relief sought, Plaintiff cannot show that he has a likelihood of success on the merits, that he faces irreparable injury in the absence of an injunction, that the injury to the Federal Defendants and Rust from interfering with implementation of the Amendments is outweighed by the injury to Plaintiff, or that the public interest weighs in favor of an injunction.

## I.    This Court lacks jurisdiction to affect the OCC's and the Board's Consent Orders and Amendments issued under 12 U.S.C. § 1818

The Congressional withdrawal of jurisdiction in 28 U.S.C. § 1818(i) is expressed in clear and categorical terms.[9]  Except as specifically provided,[10] "no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any notice or order under [sections 1818, 1831o, or 11831p-1 of Title 12], or to review, modify, suspend, terminate, or set aside any such notice or order."  12 U.S.C. § 1818(i)(1).  The Supreme Court has confirmed the breadth of this "plain, preclusive language" *Board of Governors v. MCorp Fin. Inc.*, 502 U.S. 32, 39 (1991) (holding that court lacked jurisdiction to enforce automatic stay in bankruptcy against agency enforcement proceeding).

---

[9] The withdrawal of jurisdiction effected by section 1818(i) falls within Congress's authority under Article III, section 1 over the jurisdiction of federal courts other than the Supreme Court.  *See First Nat'l Bank of Scotia v. United States*, 530 F. Supp. 162, 167 (D.D.C. 1982).

[10] Judicial review of agency action under the Federal Deposit Insurance Act is available in only three situations: 1) district court jurisdiction to enjoin temporary agency orders pending completion of administrative proceedings; 2) court of appeals review of a final agency enforcement action; and 3) district court jurisdiction to enforce an effective and outstanding agency notice or order.  *Board of Governors of the Federal Reserve System v. MCorp Fin. Inc.*, 502 U.S. 32, 38 (1991).

Courts have repeatedly acknowledged and given full effect to the Congressional intent behind the provision.  *See Hindes v. FDIC*, 137 F.3d 148, 162-64 (3d Cir. 1998) (holding that section 1818(i) bars injunctive and declaratory relief to shareholders of bank put into receivership under 12 U.S.C. § 1818; shareholders had asserted claims against bank regulator but court had no jurisdiction over claims by individuals not parties to administrative receivership proceedings); *Ridder v. Office of Thrift Supervision*, 146 F.3d 1035, 1039 (D.C. Cir. 1998) (affirming district court's finding of no jurisdiction under 1818(i)(1) to enjoin provision in consent order prohibiting payment of attorney fees for bank officers who were non-parties to the consent order proceedings); *American Fair Credit Ass'n v. United Credit Nat'l Bank*, 132 F. Supp. 2d 1304, 1312 (D. Colo. 2001) (finding no jurisdiction over consumer group's claim for damages asserted against a bank for breach of contract where a consent order entered against bank prohibited "payment of funds for any reason" to the consumer group; distinguishing damages claims from claims against non-bank holding company not prohibited by consent order); *Spiegel Holdings, Inc. v. Office of the Comptroller of the Currency*, 2003 WL 21087707 (D. Or. Apr.28, 2003) (finding no jurisdiction under § 1818(i)(1) over holding company's claims to enjoin OCC from requiring indirect subsidiary bank to make further draws on letter of credit required by consent order; noting "[t]he fact that [the bank] may not be able to satisfy a judgment against it does not give this court the authority to enjoin the OCC or its supervision of the Consent Order and required [letter of credit].").[11]

---

[11] Two recent district court opinions that concluded § 1818(i)(1) did not withdraw jurisdiction over various state law breach of contract and consumer protection claims brought by homeowner-borrowers against certain institutions subject to the 2011 Consent Orders are not inconsistent with the Federal Defendants' position in the instant matter. *See Rex v. Chase Home Finance LLC*, 905 F.Supp.2d 1111 (C.D.Cal. 2012);  *In re JPMorgan Chase Mortg. Modification Litig*., 880 F.Supp.2d 220 (D.Mass. 2012).  In each case, homeowner-borrowers brought claims against defendant banking institutions regarding their mortgage servicing practices.  In each case, the defendants asserted the courts lacked jurisdiction under § 1818(i)(1).  Both courts concluded, however, that jurisdiction was proper because the 2011 Consent Orders do not preclude borrowers from bringing private causes of action against the

*Ridder*, which also involved legal fees, is especially instructive.  In that case, OTS issued a consent order that restricted a holding company's use of the assets of its subsidiary depository institution on grounds that the holding company was likely to cause significant dissipation of assets or earnings of the depository institution.  146 F.3d at 1037.  The holding company's suit to enjoin this prohibition in a prior action was dismissed and the dismissal was affirmed by the D.C. Circuit.  *See Cityfed Fin. Corp. v. OTS*, 58 F.3d 738 (D.C. Cir. 1995).  At the same time that the holding company was subject to this prohibition, however, the Third Circuit found the holding company to be obligated to advance legal fees to certain of its former officers who were defendants in an unrelated action.  *See Ridder v. CityFed Fin. Corp.*, 47 F.3d 85 (3rd Cir. 1995).  Recognizing the conflict between the Consent Order and its ruling, the Third Circuit vacated its order and remanded the case to the District Court.  Eventually, the former officers filed suit against the OTS in the D.C. District Court, seeking an injunction prohibiting OTS from enforcing the consent order and requiring OTS to authorize the holding company to disburse funds to cover the former officers' legal fees and costs.  The D.C. District Court found that it had no jurisdiction under § 1818(i)(1) to entertain the former officers' action where they were non-parties to the consent order.  The D.C. Circuit affirmed, concluding that "section 1818(i) unambiguously precludes judicial review."  146 F.3d at 1041 (citing *MCorp* and *Hindes*).  Significantly, the court dismissed the officer's injunction action for lack of jurisdiction despite the Third Circuit's prior determination that the holding company otherwise had an obligation to advance the officers' attorney fees.  If a claim for attorney fees and costs recognized by a U.S.

---

institutions that are subject to the 2011 Consent Order.  *See Rex*, 905 F.Supp.2d at 1132; *In re JPMorgan Chase*, 880 F.Supp.2d at 233.  Both courts correctly noted that §1818 did not divest them of jurisdiction because the relief sought by the plaintiff homeowners in both actions did not modify, upset, or interfere with the 2011 Consent Orders.  *See JPMorgan Chase*, 880 F.Supp.2d at 232; *Rex*, 905 F.Supp.2d at 1129.  In contrast, Plaintiff's requested relief in this case is not contemplated in the Consent Orders and would preclude the Federal Defendants from disbursing funds to the injured borrowers, via the Paying Agent, pursuant to the Consent Orders.

Court of Appeals cannot be compelled given the jurisdictional bar of Section 1818(i)(1), then *a fortiori* Plaintiff's assertion of a charging lien fares no better.

Here, because the declaratory and injunctive relief sought by Plaintiff would necessarily "affect" the enforcement of the terms of the Amendments, specifically the terms relating to the payment of funds from the QSF to Eligible Borrowers, Plaintiff's requested relief triggers the plain meaning of the section 1818(i)(1) withdrawal of jurisdiction. Plaintiff's request for injunction and declaratory relief seeks to have the Court modify the terms of the Consent Orders and Amendments issued under section 1818(b) by requiring Rust to redirect payments from the QSF to Plaintiff rather than Eligible Borrowers. The temporary injunction has already "affect[ed]," and the ultimate relief requested would continue to "affect," the Federal Defendants' "enforcement" of the Amendments arising from their enforcement actions against the Participating Servicers. *See Hindes*, 137 F. 3d at 160 (recognizing broad meaning of term "affect" in similar withdrawal-of-jurisdiction statute, 12 U.S.C. § 1821(j)).

The Court should conclude that any action taken against Rust (or the Federal Defendants) with respect to payments made from the QSF necessarily affects the Federal Defendants' enforcement actions as set forth in the Consent Orders and the Amendments in contravention of 12 U.S.C. § 1818(i)(1). The Federal Defendants have directed the Participating Servicers to compensate Eligible Borrowers through payments from the QSF administered by Rust; any order requiring Rust to make QSF payments to any other person, including Plaintiff, or to fail to make payments to the Eligible Borrowers, impinges on the Federal Defendants' administrative authority and is therefore prohibited by 12 U.S.C. § 1818(i)(1). This action should therefore be dismissed pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction.

**II.     There is no basis under Florida law for asserting charging liens against the QSF**

Even if this Court finds that it has jurisdiction over this action, the case should be dismissed for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).

Taking the facts alleged in Plaintiff's pleadings as true, Plaintiff has no legal basis under Florida law for asserting charging liens against the QSF.  In Florida, a charging lien "is an equitable right to have costs and fees due an attorney for services in the *suit* secured to him in the *judgment* or *recovery* in *that particular suit*."  *US Acquisition, LLC v. Tabas, Freedman, Soloff, Miller & Brown, P.A.*, 87 So.3d 1229, 1231 (Fla. 4th DCA 2012) (quoting *Sinclair, Louis, Siegel, Heath, Nussbaum & Zavertnik, P.A. v. Baucom*, 428 So.2d 1383, 1384 (Fla.1983)) (emphasis added).  A charging lien "attaches to the *judgment* to ensure an attorney is compensated for his services." *Id.* at 1232 (citation omitted; emphasis added).  As explained below, the QSF payments are not proceeds of a *judgment* or *recovery* from a particular *suit* as those terms – judgment, recovery, suit – are defined by Florida law.  Consequently, as to funds in the QSF there is nothing to which Plaintiff's charging liens can attach, and Plaintiff's claimed charging liens against the QSF are *void ab initio*.  Thus, Plaintiff's action must be dismissed.

As a threshold matter, the Consent Orders were not the result of a lawsuit in which Plaintiff has rendered services.  Under Florida law, there is a preference "for pursuing charging liens in the original action where the attorney's work is performed[.]"  *Richman, Greer, Weil, Brumbaugh, Mirabito, & Christensen, P.A. v. Chernak*, 991 So.2d 875, 879 (Fla. 4th DCA 2008) (citation omitted); *see id.* (noting "it does not appear appropriate to seek enforcement of the [charging] lien in forums where the attorney has not directly participated").  A "suit" is generally defined as "Any proceeding by a party or parties against another in a court of law." *See* Black's Law Dictionary (9th ed. 2009).

Here, the payments from the QSF are not the product of a lawsuit or proceeding involving any of Plaintiff's clients as a party.  First, the Amendments directing the QSF payments to Eligible Borrowers did not arise from a proceeding before a court of law.  Instead, the Federal Defendants issued the Consent Orders and Amendments in the course of administrative proceedings before the relevant federal agency pursuant to 12 U.S.C. § 1818(b).

Moreover, Plaintiff did not represent any party in the administrative proceeding that led to the issuance of the Consent Orders or the Amendments, as no individual borrower was a party to those actions.  Rather, the individual borrowers are, in essence, third party beneficiaries of the Consent Orders and the Amendments issued by the Federal Defendants against the Participating Servicers.  Indeed, the Amendments make it plain that while an individual borrower may receive a payment as a result of them, the receipt of that payment has no effect on the borrower's right to pursue (or to continue to pursue) any litigation based upon the bank's foreclosure or mortgage servicing practices.  *See supra* note 5.

Because the payments to borrowers from the QSF pursuant to the Amendments were not the result of litigation before a court of law in which Plaintiff rendered services, Plaintiff has no equitable right to assert charging liens against the QSF.  *See*, *e.g.*, *Zamren v. Allstate Ins. Co.*, 4 Fla. L. Weekly Supp. 757 (11th Cir. App. 1997) (unpublished decision)[12] (Affirming dismissal of attorney's action to enforce charging lien against former client's insurance company because former client settled claim without ever filing lawsuit; consequently, insurance company was under no legal duty to protect attorney's claim for attorney's fees.  Attorney's remedy was to file action against his client so his claim could be adjudicated on merits.).

---

[12] Attached as Exhibit 5.

As no suit occurred, it follows *a fortiori* that the QSF payments do not constitute the proceeds of a judgment or recovery from a suit to which Plaintiff's charging liens can attach. In Florida, "judgment" is defined as "[a] determination of a court of law; a judicial decision. A court act creating or affirming an obligation, such as a debt." *Tacher v. Mathews*, 845 So.2d 332, 335 (Fla. 3d DCA 2003) (quoting The American Heritage Dictionary 975 (3d ed.1992)).[13] In Florida, "recovery" means "the obtaining of right to something by verdict or judgment of a court of law." *Gallagher v. Manatee Cnty.*, 927 So.2d 914, 917 (Fla. 2d DCA 2006) (quoting Random House Unabridged Dictionary 1613 (2d ed. 1993)); *id.* (quoting Black's Law Dictionary 1302 (8th ed. 2004)) (defining recovery as "[a]n amount awarded in or collected from a judgment or decree"). As set forth above, the QSF payments are the result of the Amendments issued by the Federal Defendants pursuant to their enforcement authority under 12 U.S.C. § 1818(b). The QSF payments are not proceeds of a "judgment" or "recovery" under Florida law because the payments were not the result of a judicial verdict or determination. Accordingly, Plaintiff's charging liens cannot attach to the QSF.[14]

---

[13] *See also Tacher*, 845 So.2d at 335 (quoting Black's Law Dictionary (7th ed.1999)) (Judgment defined as "a court's final determination of the rights and obligations of the parties in a case."); *Irving Trust Co. v. Kaplan*, 20 So.2d 351, 354 (Fla. 1944) ("A final judgment has been defined as one which determines and disposes of the whole merits of the cause before the Court by declaring that the plaintiff either is or is not entitled to recover by the remedy chosen . . . .").

[14] To the extent Plaintiff might attempt to characterize the QSF payments as a settlement to which his purported liens might attach, that argument equally is unavailing. Under Florida law, a charging lien can only attach to the proceeds of a settlement where the lien is asserted while the settlement funds remain within the custody of the court. *See Litman v. Fine, Jacobson, Schwartz, Nash, Block & England, P.A.*, 517 So.2d 88, 92 n.4 (Fla. 3d DCA 1987) ("Where, however, there has been a settlement, the funds may be outside the custody of the court, making the assertion of a lien 'before the close of the original proceeding' essential to maintenance of the right in the original action to enforce the lien against the settlement proceeds.") (quoting *Daniel Mones, P.A. v. Smith*, 486 So.2d 559, 561 (Fla.1986)). *See also Daniel Mones, P.A.*, 486 So.2d at 562 (Boyd, C. J., concurring) ("I agree that there was no charging lien on the settlement proceeds because after settlement and dismissal of the litigation there was no judgment, fund, or res, within the control of the court, to which the lien could attach. The charging lien does not simply exist by operation of law but depends on some action of the court."). Here, as in *Zamren v. Allstate Ins. Co.*, 4 Fla. L. Weekly Supp. 757 (11th Cir. App. 1997), no court has ever had jurisdiction over the Consent Orders or the Amendments that resulted in the QSF payments. Consequently, the QSF was never within the custody or control of a court. As such, whether the QSF payments are characterized as proceeds of a judgment, recovery, or settlement,

In sum, the Federal Defendants issued the Consent Orders and the Amendments pursuant to their authority under 12 U.S.C. § 1818(b).  The Consent Orders are not the result of a proceeding before a court of law in which Plaintiff rendered services and they do not constitute a judgment or recovery as defined by Florida law.  Moreover, the QSF payments, which flow directly from the Amendments, cannot constitute proceeds of a judgment or recovery.  Under Florida law, "where there are no *proceeds* of the judgment, there is nothing to which a lien may, as a practical matter, attach." *Litman v. Fine, Jacobson, Schwartz, Nash, Block & England, P.A.*, 517 So.2d 88, 92 (Fla. 3d DCA 1987) (emphasis in original) (citations omitted); *see also Pasin v. Kroo*, 412 So.2d 43 (Fla. 3d DCA 1982) ("[C]harging lien on funds recovered for a client through the attorney's services may issue only if . . . the attorney has, in fact, recovered proceeds for his client.").  Accordingly, Plaintiff has no equitable right to assert charging liens against the QSF, and Plaintiff's claims must be dismissed.

## III.    Plaintiffs Cannot Demonstrate Entitlement to Any Injunctive Relief

"[T]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Sampson v. Murray*, 415 U.S. 61, 88 (1974).  Here, as set forth below, Plaintiff has failed to demonstrate any of the elements necessary to warrant imposition of a temporary injunction order.  Accordingly, the injunction order was improvidently entered by the Florida state court and should be dissolved pursuant to Fed. R. Civ. P. 65(b)(4).

### A.  Plaintiff Has No Substantial Likelihood of Success on the Merits

For the reasons set forth above, *see* §§ I & II, *supra*, Plaintiff cannot demonstrate that it has any likelihood of success on the merits.  Plaintiff's claim is barred by 12 U.S.C. § 1818(i)(1), and in

---

there is no "fund, or res, within the control of the court, to which the lien could attach." *Daniel Mones, P.A.*, 486 So.2d at 562.

any event Plaintiff has no legitimate claim under Florida law.

### B. Plaintiff Will Not Suffer Irreparable Injury If the Injunction Is Dissolved

A moving party's showing of irreparable injury is "the *sine qua non* of injunctive relief."

*Northeastern Fl. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896

F.2d 1283, 1285 (11th Cir. 1990) (citation omitted).  An injury is irreparable only where it

"cannot be undone through monetary remedies."  *Id.  See also BellSouth Telecomm., Inc. v.*

*MCIMetro Access Transmiss. Servs., LLC*, 425 F.3d 964, 970 (11th Cir. 2005) ("economic losses

alone do not justify a preliminary injunction").  Regardless of how substantial, mere injuries "in

terms of money, time and energy necessarily expended in the absence of a stay, are not enough.

The possibility that adequate compensatory or other corrective relief will be available at a later

date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."

*NE. Fla. Chapter of the Ass'n of Gen. Contrs. of Am.*, 896 F.2d at 1285 (quoting *Sampson*, 415

U.S. at 90).

Here, Plaintiff's alleged injury is purely financial.  Therefore, by definition, the alleged

injury can be addressed through monetary remedies and Plaintiff cannot show irreparable injury.

If Plaintiffs' clients owe him money, Plaintiff can seek relief in the Florida state courts by

reducing outstanding debts owed to judgment and enforcing those judgments by all means

allowable under Florida law.  *See*, *e.g.*, Fla. Sta. Ann. §§ 77.01 *et seq.* (Florida's garnishment

statute).  Accordingly, Plaintiff is not entitled to injunctive relief.  *See*, *e.g.*, *Pharmerica, Inc. v.*

*Eagle Healthcare, Inc.*, 2011 WL 6719157, at *5-6 (M.D. Fla. Sept. 30, 2011) (denying

preliminary injunction because alleged imminent harms can be remedied by money damages and

are therefore not irreparable); *Kalb v. Quixtar, Inc.*, 2008 WL 879406, at *7-8 (M.D. Fla. Mar.

28, 2008) (denying preliminary injunction because, *inter alia*, harm alleged was expenditure of

money and time, neither of which constitute irreparable injury).

**C. The Remaining Injunctive Relief Factors – the Balance of Harm and the Public Interest – Also Weigh Against Continuation of the Injunction**

The respective harms, on the one hand, to the Federal Defendant from continuation of the injunction and, on the other hand, to Plaintiff from dissolution of the injunction are far different in nature and gravity.  The harm to the Federal Defendants is that their efforts as prudential regulators to further the public interest will be frustrated.  Plaintiff's injunction frustrates the public interest by undermining a payment scheme set out in the Amendments and related documents, by diverting and delaying the dispensation of compensation to Eligible Borrowers who may have been financially injured by servicer misconduct.  The injunction interferes with the policy behind the Amendments, which as the Comptroller of the Currency stated is to "get more money to more people more quickly and [to] speed recovery in the nation's housing markets."  *See* OCC Press Release of January 7, 2013, *supra*, p. 7.  In contrast, any supposed harm to Plaintiff can easily be addressed through normal debt collection practices allowed under Florida law.  Therefore, dissolution of the injunction does not threaten Plaintiff with any actual harm.  Given the existence of actual harm to the Federal Defendants from continuation of the injunction and the absence of any true harm to Plaintiff from dissolution of the injunction, the equities tip decidedly in favor of the Federal Defendants.  For this same reason, the public interest weighs heavily in favor of removing the injunction.

**CONCLUSION**

For the foregoing reasons, the Office of the Comptroller of the Currency and the Board of Governors of the Federal Reserve System respectfully request that this Court dismiss with prejudice Plaintiff's action in its entirety and dissolve the temporary injunction improvidently entered by the Florida state court.

Respectfully submitted,

RICHARD M. ASHTON
Deputy General Counsel

DANIEL P. STIPANO
Deputy Chief Counsel

KATHERINE H. WHEATLEY
Associate General Counsel

HORACE G. SNEED
Director of Litigation

JENNIFER L. SUTTON
Senior Counsel

GREGORY F. TAYLOR
Assistant Director of Litigation

MITCHELL B. KLEIN
Attorney

PETER C. KOCH
Counsel

Board of Governors
  of the Federal Reserve System
20th Street & Constitution Avenue, NW
Washington, DC 20551
Telephone: (202) 452-3838

*s/ Gabriel A. Hindin*
GABRIEL A. HINDIN
Litigation Attorney
Florida Bar No. A5501884

*Counsel for the Board of Governors of the Federal Reserve System*

Office of the Comptroller of the Currency
400 7th Street, SW
Washington, DC 20219
Telephone: (202) 649-6300

*Counsel for the Office of the Comptroller of the Currency*

## CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that on June 25, 2013, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on Karen Barnet-Backer, Esq., Law Offices la Ley con John H. Ruiz, P.A. and John H. Ruiz, P.A., Counsel for Plaintiffs, 4181 S.W. 74th Court, Miami, FL 33155, kbacker@lawofficeslaley.com, and Stephanie Reed Traband, Esq., Levine Kellogg Lehman Schneider + Grossman LLP, Counsel for Defendant Rust Consulting, Inc., 201 South Biscayne Boulevard, Miami, Florida 33131, srt@lklsg.com, by CM/ECF.


                                      *s/ Gabriel A. Hindin*
                                      GABRIEL A. HINDIN
                                      Litigation Attorney
                                      Florida Bar No. A5501884

                                      Office of the Comptroller of the Currency
                                      400 7th Street, SW
                                      Washington, DC 20219
                                      Telephone: (202) 649-6300